Rosenshein v. Meschel Judge, can I just clarify, do you want a letter by money in either way? Sure, that'll be best. Thank you. Good afternoon, Your Honors. Good morning. May I please the Court? My name is Michael Barrows, and I represent Mr. Arnie Rosenshein, Arnold Rosenshein, doing business at Parkwest Realty Co. Your Honors, this was a RICO action brought against individuals and companies owned by these individuals for a longstanding scheme to defraud investors across the United States and that issue here, Mr. Rosenshein had invested in. The underlying court found and applied Merrill Lynch to state that the RICO injury, the date at which the statute of limitations would begin to run, started at the time of investment. In this case, Judge, that is and that is for unsecured creditors. This court in First Nationwide and Motorola have established a different point of reference when it comes to secured creditors. In this case, Judge, the documents irrefutably undeniably confirm that Mr. Rosenshein was a secured lender. Didn't you take the position below that he was not a secured creditor? Well, Your Honor, there were two paragraphs in the complaint in which it says that he did not have control over the insurance. I respectfully direct this court's attention to a Second Circuit case, Nechis, N-E-C-H-I-S-V, Oxford Health Plans, and that's 421 F. 3rd 96. In that case, it says that the courts can consider facts in addition to documents that are annexed to the complaint. The significance of being secured, though, is that it gives you a right to contractual or legal remedies that go beyond that of an investor generally. It appears that the participation and servicing agreement that you rely on for evidence of the investments being secured pertains only to the 24th Street investment, not any of the others, and that even as to the 24th Street investment, the document expressly states that the lead lender, which is not your client, retains the exclusive right to pursue remedies in the event of a default. So it seems your client just has no legal or contractual remedies for his alleged injury that would normally go with being secured, and that that's why the date of investment was viewed as the time he had the time of his accrual. And, Judge, I would, and just to point that, I would as far as what Judge Chinitz said, there are several cases in the Second Department, including Bristol-Myers, I'm sorry, Southern District, 312 F. 2nd 549, which says that when there are contradicting documents that are annexed to a complaint and that are at odds with the complaint, that the documents are controlling. There are several other cases, and I could submit on that. Judge, I will get to your point now. The document, first of all, pertains only to the 24th Street instrument. Do you agree with that? Judge, there are various other documents, various other servicing agreements that reflect in the same fashion what is in the 24th Street, but, Judge, the 24th Street itself. That's the only one you pointed us to. Well, Judge, the other agreements, and I believe it states in my brief that they are very much similar in the rights that Mr. Rosenstein has. To address Your Honor's point, Do they all involve lead lender retaining exclusive remedy rights? Well, Judge, I don't think that it's contradicting the participation servicing agreements, because if you look at Loan 2009, and that would be at A330, Appendix 330, it says that lead lender hereby... I'm sorry, this is with respect to the 24th Street loan, right? Correct. And it says, and I'll emphasize just a portion that I need to, lead lender hereby sells to participant, and participant hereby purchases from lead lender, participant's pro rata share in the loan, and I emphasize, inclusive of the applicable loan documents, the title policy, and all other security documents and interests related to this loan. Further down, it says... Where are you? In what paragraph? These are lettered and numbered. That would be... Oh, I'm sorry. It's not A330. Referring to 329 in the sale of participation, that the lender sells and participant purchases the pro rata share in the loan, inclusive of the applicable loan documents. Paragraph one. And it states then, lead lender hereby... Yes. And in that paragraph, further down, it says the title policy and all other secured documents, all security, collateral, and interest in the property now or here and after securing the loan, and I emphasize again, and all claims against persons or entities who now or may in the future become liable for the loan. In addition... But you're overlooking the paragraph 3A, which is what you were reading from, concludes with the language that lead lender nonetheless shall hold such documents, and then later on, I'm looking for it, the language about the lead lender having the exclusive remedy rights. Bear with me. That's then at 333. But before we get to 333, where is it you want us to look? Well, at 332, paragraph 2D, it says here that... Bear with me. That Rosenshine has the absolute right to remove lead lender as servicer and administrator with respect to his pro rata share of the loan. Where are you? In what part of 4D? That's a long section. I think that's in A332. Yes, but where in the paragraph? Is it halfway through, three quarters? I'm just trying to find the language. Bear with me one second so I can give it to you. Because the first part deals with the dissolution or termination of the lead lender, and that's not what you're talking about. It says here, and it's 1, 2, 3, 4, 5, 6, it's about seven lines down. It starts with law. The beginning of the paragraph, I'm sorry, the sentence starts with law. The participant shall have the right to remove lead lender as servicer and administrator with respect to participant's pro rata share of the loan. If participant elects to take over the servicing and administration of the loan of its pro rata share of the loan, participant shall succeed to all rights, duties, and obligations of lead lender under this agreement. In this case, Judge, and a careful reading of all of these servicing agreements do show that Rosenshine and the other investors do have an unfettered right to take the place of the lead lender. They were servicers. There were investors and servicers. Let me ask, did Mr. Rosenshine hold 100% interest? He did not. There were other individuals who had pro rata shares in a similar way in this loan. Did they all then have the authority to, in the event of a failure of fiduciary obligations, to take the place of the lead lender? So they would each have an undivided interest in realizing on the collateral? It's my understanding. I am not privy because there's been no disclosure in this. This is obviously called the motion. So I don't know if the other participation servicing agreements were the same or not the same. But conceptually, right, he didn't have the authority then to come in. He had to participate with other people in case there were a failure to, if the lead lender failed. I mean, this is, there were a lot of events that had to happen including him potentially having to work out with other pro rata shareholders in order for him to have any rights to foreclose on the property at all and to act on the security. And the dominant frame of this document, as Judge Radjies pointed out, is that the lead lender had the exclusive right to act on the security. Isn't that right? I disagree in that there was another investor who was I think it's S&C Capital, who did have a share in the, who was able to get his name onto the security documents, onto the loan documents and so he would have been able to foreclose on his interest in and of itself. I can't foreclose on a 10% interest. I mean, because you don't have the relative seniority of the pro rata share participants established in these documents. Well, I agree with that, Your Honor. I don't know the way by which he would do it. I do know that the documents would afford them the right to do that. And you only have that right if the lead lender fails to comply with its fiduciary obligations. So there's a condition precedent. I do think that That's the phrase right before the part you read. And I do believe that there are other portions of the agreements in the record which I'm looking at the portion you read to us. That's contingent. I understand, Judge. And it seems to me, Your Honor, that the language of these although there is some conflicting language in here was conferring upon Mr. Rosenstein the right to assume his rights and to discharge them as servicers of the loan. Because in this case Let me ask also, even if we were to agree with you that that gave him rights and made him a secured lender of a sort, I didn't see similar language giving him remedial rights in the other form of agreement, the PSA and I think the MSA. Could you point us to language establishing a security interest in those agreements? If I may, I'll stay with you on that. I understood this to apply to the 24th Street loan only. I believe that the There are three different categories of agreements that were used in this matter, and I am unsure whether the 24th Street loan was a servicing agreement, participation in servicing agreement, was only used for the 24th Street loan. There is a breakdown of which, and I believe it's Mr. Michel's declaration where he sets forth which loans coincide with which agreements. I don't have that offhand. Do you believe that there's a similar clause in each of the agreements? I do believe that there's a similar clause which allows Mr. Rosenstein to retain his interest, undivided interest, and to discharge the lead lender, so to speak, as servicers of the loan. They were merely servicers of this loan. They repeated And to have the right then to foreclose on the property? I do believe, Your Honor, that he would have a right to foreclose. Tell us where, because you've got the burden now of saying that it was error for the district court to conclude that you were not in that position. Well, and again, for me, there was, and as Your Honors know, there was 13 volumes. I do not have that on me if I could submit... You've got the burden on this appeal. I understand that. And I, in reading your brief, the only document I saw you citing us to was the 24th Street agreement. You should look at this while we hear from your adversary. If you have anything else, you can point us to it. May I go on to the storm warnings aspect? Because I think that that's very important. Even if... In a few minutes, Counsel, we've well past your time. Well, I understand that, Your Honors. I thought I was getting... Two minutes. Okay. On the storm warnings issue, even if this Court... The clock means you went over five minutes. Oh, I'm sorry. On the storm warnings issue, the Court had stated that there were storm warnings in 2009, okay? But this was at a time where the Court points out that there was a 2008 financial crisis and collapse of the real estate market. You can't look at storm warnings in a bubble. And here the issue becomes whether a reasonably imprudent investor would have relied upon the market as a whole in saying, you know what, borrower default is at an all-time high, and these loans are defaulting because of the circumstances, economic circumstances, not because of the probability of a default. Your theory, though, was that he was sold on the premise that these were so over-collateralized that there was no risk. And so defaults in that context still would trigger a duty to inquire. Well, the defaults, the risk that would be associated with over-collateralization is different than a borrower having an issue with defaulting. I think that there's an issue. A borrower defaults. That doesn't necessarily mean that he's not going to be overly secured. It means that a borrower has defaulted and that that is where the judge said triggered the duty to inquire. But in a scenario like this, when there was, at a high point, a borrower default, the issue becomes, and it's a factual issue, when should Rosenstein have known that there was fraud amiss, that he was injured? Well, what the District Court found was the ten borrowers defaulted by the end of 2009, and then the nine foreclosures by the end of that same year with the defendants offering assorted excuses for being unable to sell property, and that was at odds with their initial predictions that these were easy-sale properties. Yes, Judge. So all the judge found was that those circumstances, even in the context of the financial crisis, would have put people on notice to make further inquiry. And I would just note on that one issue, Judge, is that the judge misapprehended the defaulting of these matters. On Lord Street, Bedford, Turn Landing, Shabbat, East Hanover, and Remson, there is no allegations in the record that the foreclosures were instituted at that point. If you look at Michelle's declaration, and you set it against the chart, the judge had misapprehended the facts of that issue. In fact, only a couple of these had foreclosures been instituted at that time. Did you argue that to us in your brief? I did not, Your Honor. I didn't think so. I didn't see it. I did not hear it. Okay. Thank you. Thank you. May it please the Court. My name is Michael Wechselbaum. I'm with the law firm of Davidoff, Hutcher & Citrin. We're the attorneys for all of the appellees other than Mr. Gleitman, who has his own counsel. I would like to deal with the issue of when the injuries occurred. And I would like to direct the Court's attention to two findings by Judge Cote and three paragraphs of the amended complaint that I submit are completely dispositive of this issue. On page four of her opinion and order, at A2830, Judge Cote said, "...as described by Rosenshine, his arrangement with the defendants was that he had no control over how his funds would be utilized and obtain no security interest or collateral in any of the mortgaged properties." That's a quote from the judge's opinion and order. The judge also said, in a footnote on pages 13 and 14 of her opinion and order, at the record A2839 to 2840, that Rosenshine's, quote, "...purported injury was not speculative at the time of investment because he alleges that he lost all control over the funds he invested with the defendants and that he had no security interest in the collateral for the loans." Now I'd like to direct the Court's attention to three paragraphs of the amended pleading. This is an amended pleading. It's at A257 to A258. In paragraph 74, it is alleged, "...in fact, the defendants structured their agreement so that the plaintiff and other investors were not permitted to participate in any of the decisions relating to the loans and the defendants would maintain complete and unfettered control over the funds provided by plaintiff and other participating investors." Paragraph 75, right under that, "...plaintiff obtained fractional interest in the loan with the majority of the recorded mortgage interest in the names of the various corporate and LLC defendants who were then entrusted to lend the monies invested by plaintiff and others to specific projects in their capacity as, quote, lead lender." And finally, in paragraph 79, which goes over to the next page, "...in effect, the agreements entered into between plaintiff and defendants provided the plaintiff and other participating investors make significant investments in the subject loans and, pursuant to the various agreements, waive complete control over the loans and the monies lent by plaintiff. Further, the plaintiff and other participating inventors would have no recorded collateral or security interest in any mortgage property." And as this Court, this panel has already noted, the interest that Mr. Rosenstein had in these loans was usually about 5 percent. I think it was never more than 10 percent. I think sometimes it was 1 percent, 2 percent. I saw a number of 5 percents. He was a minority investor in a loan project. They were all participants in these loans. If the District Court's analysis is right and Merrill Lynch controls here because this was an unsecured interest and the investment, what was the clear and definite measure of damages? If he had sued a month later saying, you know, I got a bad feeling about this, I think the collateral isn't really worth what I've been told and, you know, what would he have been able to recover? What measure of damages does he have? Well, the damages would have to be determined during the course of the litigation. There's no question that everyone who was an investor... At what point would you look at the day the money was invested? Would you take into account the collateral that there was? At the date of trial, I think you would have to take into account what the collateral that was then remaining was worth. Yes, Your Honor. And then it would have to be divided up between the various investors. So depending upon the date of how the litigation went, there would be variable measure of... Absolutely. You would not have to wait for any foreclosure to have occurred. No. I don't think so. So at the time that the injury became ripe and suit could proceed, you have to be somewhat speculative about what... On that, I think you would, Your Honor. I don't disagree with that. And you think that meets the RICO clear and definite measure test? I think it does, Your Honor, because the injury occurred when they made the investment and the amount of damages is contingent to some extent upon what is recovered from the lenders. Remember, the defaults were defaults by the lenders and that was not a predicate act in the RICO claim. That was just one of the storm warnings of the damages that had occurred. Because the injury in the first instance is their surrender of their own money to this investment and then what the actual damages might be would be a function of whether anything could be recouped for them. That's our argument. I think you understand it, Judge. Thank you. Thank you. Mr. Edelberg, you're going to take some time to argue as well? Good morning. My name is David Edelberg, Cohen Indictment Counsel for Mark Gleitman. My main goal is initially to make sure that Mark Gleitman doesn't get lost in the wash. He's barely mentioned in the complaint. He's barely mentioned in the opinion. And there are some significant, compelling differences between Mr. Gleitman and his other defendants. First of all, it's acknowledged in 8261 in the amended complaint, Mr. Gleitman severed all connections with these loan investments in September of 2007. The complaint actually references the wrong year. It says 2008. But nonetheless, starting in September 2007, and this is set forth in Mr. Gleitman's certification as well, starting nine years before he was named as a defendant, Mr. Gleitman left the premises. He had no further involvement with the other defendants. He had no further involvement with the loans. All connections were severed. That means that when you measure the timeline for Mark Gleitman, you're measuring nine years, starting with September 2007 to when he's first named as a defendant, which is in the amended complaint in January of 2016. Five of the loans that are asserted, there are 11 loans asserted in the amended complaint, five of them arose after September of 2007, arose after Mark Gleitman left severed his connections. All of the six loans that were originated while Mark Gleitman was still involved with this operation, all six of them were in default by September, by 2009. As a result, Mark Gleitman is barely mentioned. He's not mentioned at all in the original complaint at all. He's not a party. And in the first amended complaint, he's barely mentioned. The complaint fails to allege that Mr. Gleitman had any communications with the appellant, fails to allege any representations. In fact, he's mentioned by name only three times in the complaint. He's mentioned in paragraph five, I think there's a generic reference to him engaging in racketeering. He's mentioned that, I think, 32, he resides in New York City is the allegation. That's A251. And at A251 as well, he stated that he was a principal of Mercury Credit and Mercury Capital. The only other reference to Mr. Gleitman in this amended complaint is at A261, where it's stated that there was, quote, a serious disagreement, unquote, which led to the, quote, breakup, unquote, of that firm, acknowledging that he had severed all connections. Therefore, if you accept what I believe is the appellant's contention that he became aware in 2011, even still, Mr. Gleitman was not named as a defendant until five years later, in January of 2016. With respect to storm warnings, I want to note that the storm warnings were overwhelming. The amended complaint repeatedly alleges representations that the loans were safe, conservative, short-term, and had little risk. A few citations are A258, 265, 267, 274, 275, 282, to name just a few. These loans were short-term. The Bedford loan was originated in 2003. It was a 12-month term. It defaulted in 2008. Foreclosure was in 2008, and that's at A265, 266. A Tarpon Springs loan originated in 2006. It was also a 12-month term, defaulted in early 2007. That's at A273. The Shabbat loan originated in March 2007, 12-month term, defaulted by May 2009. That's A280, 283. By 2009, almost all the loans, I think 10 of 11, were in default. That's A261. How could any investor not know when he's not getting a monthly distribution of interest because the loan is not performing? How could any investor not recognize that he didn't receive, he or she did not receive repayment of principal 12 months after the loan was issued? The appellant had to recognize that, I'd say at the latest, 2009, that these investments were not safe, as represented, were not conservative, as represented, involved a lot of risk, and certainly were not short-term. So I submit that the allegations, that the evidence in the amended complaint, that the storm warnings were overwhelming, were in fact overwhelming, as set forth in the amended complaint. Finally, I want to know public policy. The position argued by the appellant would allow a plaintiff to delay foreclosure, would allow for these matters to be heard. I think the first loan in 2002 was Lordstown. We have a great body of jurisprudence regarding limitations, to not have stale claims where witnesses are unavailable, documents unavailable, and who can remember what happened nine years ago, eight or nine years ago? I think when you look at a calculation of damages, you look at what it was worth and how it was represented and how it was impacted. You could also project what the outcome of a foreclosure can be by getting an appraisal, looking at the cost of a sale, looking at the liens, and doing a projection. Thank you very much. Thank you. We'll give you your full three minutes in rebuttal. With respect to the 9A particularity standard, I believe it's set forth in my reply brief starting at page 13. I don't think that the who, what, where, when, why, how is required by this court. I think to reconcile it with Rule 8, short, plain statement of the participation would be sufficient. We do more than that. The complaint does more than that. Page 15, 16 of the complaint, just as an illustration, demonstrates that. What are the allegations with respect to Mr. Gleitman? The allegations with respect to Mr. Gleitman, Judge, they are not specific allegations. They talk about individual defendants versus the entity defendants. But I believe that in Be with me one second, Your Honor. The fact that he was a, and I believe it's page 15 of my brief, the fact that he was involved in these transactions and knew about these transactions, I think is, you can't deny that he knew and that he participated in this being that he was an owner of these companies with the other three individuals. But to get back to Your Honor's question, there are, and this is my notes, I don't have the full 15 volumes, but at 562, A562, it talks about, and I have a quote here, it says, lender who simultaneously with the execution of the servicing agreements, quote, made or purchased the mortgage loan. Lender, referring to Mr. Rosenstein. He's specifically referred to as a lender in this. And it's talking about the purchase of the mortgage loan. There's also a citation here that I have, A495. I do not have that volume, but I do have A562. It is another servicing agreement on another one of the loans. As set forth in my But I'm not sure how it helps us. What am I missing? It is my belief, and at page 18, I reference all of the servicing agreements, that these servicing agreements do reiterate what's stated in page 18 of page 18. And every single loan is set forth for the court's convenience, the appendix at page 18. I do believe that in reading those, carefully reading those, Your Honors will see and agree that there is an interest in there that Mr. Rosenstein has. He has the discretion to discharge these lead lenders who are really servicers. When they breach their fiduciary duty? It says here, at any time without cause, on page A496, and again, I don't have the paragraph, I just have my notes, Rosenstein agrees to engage, defend appellees as servicers of his secured interest, of his interest, sorry, and that's 495. It says engage. The rest is me. Correct. And that he may terminate them at any time with or without cause. And that's at A399, paragraph 84. And it seems here, and Michelle himself states, and I think this is important, that the investors took ownership of the properties, one of the properties, and that's at A399, paragraph 84. What would happen here is the investors, when there would be a default, the investors would get back the properties in another LLC or PLLC, and they would get an undivided interest in this PLLC. That's what occurred with these transactions when the loans were foreclosed. Their participation interest would then be converted into interest in these LLCs. And that's in the record. And so, again, in comporting with Motorola, in comporting with First Nationwide, when they get this interest back, there's still no definite injury until this is sold to a third party. And then they go and sell these to a third party, and then they figure out what their deficiencies are. And in Michelle's declaration, he discusses realized losses. He makes reference to realized losses after the collateral was sold, after the properties were sold. In general, with fraud, a party is deemed injured when he turns over his money based on a false representation. Now, the precedent that talks about you being secured is that a secured interest then gives you further rights with respect to the interest you acquire. And so those interests can be the product of further injury. But I'm not sure I understand that just because there's the ability to terminate a servicer, that your client has secured interests here. Well, and Judge, in fact, once these are foreclosed and the borrowers are taken out, the there's another entity formed, and each of these investors have a pro-rata share of that, and they get K-1s. And they get an interest in these companies. So the machinations of these various, after default, what occurs, they do, in fact, get a security interest subsequent to that. And it's also in the participation agreements, but subsequent to that, they're able to get them that way. Thank you. Thank you to both sides, or all three sides, I guess you should say. Thank you. We're going to take the case under advisement. That's the last case on our docket today, so we stand adjourned.